**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| C & C CONSULTING, INC., a Kansas Corporation | ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | No. |
| 3 POINT MEDIA – KANSAS LLC, an Illinois Limited Liability Company, BRUCE BUZIL, and CHRIS DEVINE, | ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

**COMPLAINT FOR BREACH OF CONTRACT AND TO COLLECT**
**ON PROMISSORY NOTE AND LIMITED GUARANTEE**

Plaintiff C & C CONSULTING, INC., a Kansas Corporation ("C & C") by its attorneys, Ungaretti & Harris LLP, states its complaint against Defendants 3 POINT MEDIA – KANSAS LLC, an Illinois Limited Liability Company ("3 POINT"), BRUCE BUZIL, individually, and CHRIS DEVINE, individually as follows:

**NATURE OF THE ACTION**

1.     This is a dispute arising out of 3 POINT'S purchase of substantially all the assets of C & C pursuant to an asset purchase agreement, followed by a series of defaults and threats of defaults on its promise to pay C & C pursuant to a promissory note and by failing to pay amounts due and owing on the promissory note when due.

2.     In or about February 2004, C & C sold 3 POINT substantially all of the assets of C & C, which assets had been used in the ownership and operation of radio station KANS-FM, Osage City, Kansas, pursuant to an Asset Purchase Agreement dated as of May 7, 2003.

3.      In connection with the sale of assets, 3 POINT executed and delivered to C & C its promissory note for $1,000,000.00.   A copy of said note is attached hereto as Exhibit 1.

4.      In connection with the sale of assets, 3 POINT executed and delivered to C & C a security agreement giving C & C a security interest in the sold assets as security for the payment of the promissory note.

5.      In connection with the sale of assets, BRUCE BUZIL and CHRIS DEVINE, managers and owners of 3 POINT, provided a Limited Guaranty of payment of the Promissory Note.   A copy of said guaranty is attached hereto as Exhibit 2.

6.      In connection with the sale of assets, C & C and 3 POINT agreed to a closing settlement statement.   A copy of said closing statement is attached hereto as Exhibit 3.

7.      In connection with the sale of assets, C & C, 3 POINT and MONROE CAPITAL FUNDING, LLC entered into a subordination and intercreditor agreement.   A copy of said subordination and intercreditor agreement is attached hereto as Exhibit 4.

8.      Upon and after the closing of the sale of assets, 3 POINT made the following payments to C & C:

| | Principal | | Interest | | Total Due | Date | | Payment Amount Recd. | | Loan Balance | | Fees |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $ | 1,000,000.00 | $ | 1,315.07 | $ | 1,001,315.07 | 3/3/2004 | $ | 1,315.07 | $ | 1,000,000.00 | | |
| $ | 1,000,000.00 | $ | 8,333.33 | $ | 1,008,333.33 | 4/5/2004 | $ | 8,333.33 | $ | 1,000,000.00 | | |
| $ | 1,000,000.00 | $ | 8,333.33 | $ | 1,008,333.33 | 5/4/2004 | $ | 8,333.33 | $ | 1,000,000.00 | | |
| $ | 1,000,000.00 | $ | 8,333.33 | $ | 1,008,333.33 | 6/4/2004 | $ | 8,333.33 | $ | 1,000,000.00 | | |
| $ | 1,000,000.00 | $ | 8,333.33 | $ | 1,008,333.33 | 7/6/2004 | $ | 8,333.33 | $ | 1,000,000.00 | | |
| $ | 1,000,000.00 | $ | 8,333.33 | $ | 1,008,333.33 | 8/2/2004 | $ | 8,333.33 | $ | 1,000,000.00 | | |
| $ | 1,000,000.00 | $ | 8,333.33 | $ | 1,008,333.33 | 9/2/2004 | $ | 8,333.33 | $ | 1,000,000.00 | | |
| $ | 1,000,000.00 | $ | 8,333.33 | $ | 1,008,333.33 | 10/4/2004 | $ | 8,333.33 | $ | 1,000,000.00 | | |
| $ | 1,000,000.00 | $ | 8,333.33 | $ | 1,008,333.33 | 11/1/2004 | $ | 8,333.33 | $ | 1,000,000.00 | | |
| $ | 1,000,000.00 | $ | 8,333.33 | $ | 1,008,333.33 | 12/1/2004 | $ | 8,333.33 | $ | 1,000,000.00 | | |
| $ | 1,000,000.00 | $ | 8,333.33 | $ | 1,008,333.33 | 1/7/2005 | $ | 8,333.33 | $ | 1,000,000.00 | | |
| $ | 1,000,000.00 | $ | 8,333.33 | $ | 1,008,333.33 | 2/2/2005 | $ | 8,333.33 | $ | 1,000,000.00 | | |
| $ | 1,000,000.00 | $ | 8,333.33 | $ | 1,008,333.33 | 3/16/2005 | $ | 8,333.33 | $ | 1,000,000.00 | | |
| $ | 1,000,000.00 | | | $ | 1,000,000.00 | 3/31/2005 | $ | 50,000.00 | $ | 950,000.00 | | |
| $ | 950,000.00 | $ | 1,666.67 | $ | 951,666.67 | 4/6/2005 | $ | 1,666.67 | $ | 950,000.00 | | |
| $ | 950,000.00 | $ | 10,000.00 | $ | 960,000.00 | 4/6/2005 | $ | 10,000.00 | $ | 950,000.00 | | |
| $ | 950,000.00 | $ | 10,000.00 | $ | 960,000.00 | 5/9/2005 | $ | 10,000.00 | $ | 950,000.00 | | |
| $ | 950,000.00 | $ | 10,000.00 | $ | 960,000.00 | 6/27/2005 | $ | 10,000.00 | $ | 950,000.00 | | |
| $ | 950,000.00 | $ | 10,000.00 | $ | 960,000.00 | 7/1/2005 | $ | 10,000.00 | $ | 950,000.00 | | |
| $ | 950,000.00 | $ | 10,000.00 | $ | 960,000.00 | 8/1/2005 | $ | 10,000.00 | $ | 950,000.00 | | |
| $ | 950,000.00 | $ | 10,000.00 | $ | 960,000.00 | 9/5/2005 | $ | 10,000.00 | $ | 950,000.00 | | |
| $ | 950,000.00 | $ | 10,000.00 | $ | 960,000.00 | 10/10/2005 | $ | 10,000.00 | $ | 950,000.00 | | |
| $ | 950,000.00 | $ | 10,000.00 | $ | 960,000.00 | 11/4/2005 | $ | 10,000.00 | $ | 950,000.00 | | |
| $ | 950,000.00 | $ | 10,000.00 | $ | 960,000.00 | 12/9/2005 | $ | 10,000.00 | $ | 950,000.00 | | |
| $ | 950,000.00 | $ | 10,000.00 | $ | 960,000.00 | 1/21/2006 | $ | 10,000.00 | $ | 950,000.00 | | |
| $ | 950,000.00 | $ | 10,000.00 | $ | 960,000.00 | 2/18/2006 | $ | 10,000.00 | $ | 950,000.00 | | |
| $ | 950,000.00 | $ | 10,000.00 | $ | 960,000.00 | 3/16/2006 | $ | 10,000.00 | $ | 950,000.00 | | |
| $ | 950,000.00 | | | $ | 950,000.00 | 3/28/2006 | | | $ | 950,000.00 | $ | 10,339.00 |
| $ | 950,000.00 | | | $ | 950,000.00 | 3/28/2006 | | | $ | 950,000.00 | $ | 3,145.00 |
| $ | 950,000.00 | $ | 10,000.00 | $ | 960,000.00 | 4/10/2006 | $ | 10,000.00 | $ | 950,000.00 | | |
| $ | 950,000.00 | $ | 10,000.00 | $ | 960,000.00 | 6/8/2006 | $ | 10,000.00 | $ | 950,000.00 | | |
| $ | 950,000.00 | | | $ | 950,000.00 | 6/8/2006 | | | $ | 950,000.00 | $ | 3,145.00 |
| $ | 950,000.00 | $ | 10,000.00 | $ | 960,000.00 | 6/16/2006 | $ | 10,000.00 | $ | 950,000.00 | $ | 3,145.00 |
| $ | 950,000.00 | $ | 8,028.49 | $ | 958,028.49 | 7/11/2006 | $ | 3,000.00 | $ | 955,028.49 | | |
| $ | 955,028.49 | $ | 281.10 | $ | 955,309.59 | 7/14/2006 | $ | 25,000.00 | $ | 930,309.59 | $ | 3,145.00 |
| $ | 930,309.59 | $ | 9,053.65 | $ | 939,363.24 | 8/9/2006 | $ | 21,855.00 | $ | 917,508.24 | $ | 3,145.00 |
| $ | 917,508.24 | $ | 9,840.58 | $ | 927,348.82 | 9/18/2006 | $ | 21,855.00 | $ | 905,493.82 | $ | 3,145.00 |
| $ | 905,493.82 | $ | 9,301.57 | $ | 914,795.39 | 10/20/2006 | $ | 46,855.00 | $ | 867,940.39 | $ | 3,145.00 |
| $ | 867,940.39 | $ | 8,502.17 | $ | 876,442.56 | 11/17/2006 | $ | 21,855.00 | $ | 854,587.56 | $ | 3,145.00 |
| $ | 854,587.56 | $ | 7,830.74 | $ | 862,418.30 | 12/1/2006 | | | $ | 862,418.30 | | |
| $ | 862,418.30 | $ | 8,789.58 | $ | 871,207.88 | 1/1/2007 | | | $ | 871,207.88 | | |
| $ | 871,207.88 | $ | 8,019.89 | $ | 879,227.76 | 2/1/2007 | | | $ | 879,227.76 | | |
| $ | 879,227.76 | $ | 8,960.90 | $ | 888,188.66 | 3/1/2007 | | | $ | 888,188.66 | | |
| $ | 888,188.66 | $ | 8,760.22 | $ | 896,948.88 | 4/1/2007 | | | $ | 896,948.88 | | |

| Principal | Interest | Total Due | Date | Payment Amount Recd. | Loan Balance | Fees |
|---|---|---|---|---|---|---|
| $ 896,948.88 | $ 9,141.51 | $ 906,090.38 | 5/1/2007 | | $ 906,090.38 | |
| $ 906,090.38 | $ 8,936.78 | $ 915,027.17 | 6/1/2007 | | $ 915,027.17 | |
| $ 915,027.17 | $ 9,325.76 | $ 924,352.92 | 7/1/2007 | | $ 924,352.92 | |
| $ 924,352.92 | $ 9,420.80 | $ 933,773.73 | 8/1/2007 | | $ 933,773.73 | |
| $ 933,773.73 | $ 9,209.82 | $ 942,983.55 | 9/1/2007 | | $ 942,983.55 | |
| $ 942,983.55 | $ 9,610.68 | $ 952,594.23 | 10/1/2007 | | $ 952,594.23 | |
| $ 952,594.23 | $ 9,395.45 | $ 961,989.68 | 11/1/2007 | | $ 961,989.68 | |
| $ 961,989.68 | $ 9,804.39 | $ 971,794.07 | 12/1/2007 | | $ 971,794.07 | |
| $ 971,794.07 | $ 9,904.31 | $ 981,698.38 | 1/1/2008 | | $ 981,698.38 | |
| $ 981,698.38 | $ 9,359.75 | $ 991,058.13 | 2/1/2008 | | $ 991,058.13 | |
| $ 991,058.13 | $ 10,100.65 | $ 1,001,158.78 | 3/1/2008 | | $ 1,001,158.78 | |
| $ 1,001,158.78 | $ 9,874.44 | $ 1,011,033.22 | 4/1/2008 | | $ 1,011,033.22 | |
| $ 1,011,033.22 | $ 10,304.23 | $ 1,021,337.45 | 5/1/2008 | | $ 1,021,337.45 | |
| $ 1,021,337.45 | $ 10,073.47 | $ 1,031,410.92 | 6/1/2008 | | $ 1,031,410.92 | |
| $ 1,031,410.92 | $ 10,511.91 | $ 1,041,922.83 | 7/1/2008 | | $ 1,041,922.83 | |
| $ 1,041,922.83 | $ 10,619.05 | $ 1,052,541.88 | 8/1/2008 | $ 6,000.00 | $ 1,046,541.88 | |
| $ 1,046,541.88 | $ 10,322.06 | $ 1,056,863.94 | 9/29/2008 | $ 10,000.00 | $ 1,046,863.94 | |
| $ 1,046,863.94 | $ 10,669.41 | $ 1,057,533.35 | 10/1/2008 | | $ 1,057,533.35 | |
| $ 1,057,533.35 | $ 10,430.47 | $ 1,067,963.81 | 11/1/2008 | | $ 1,067,963.81 | |
| $ 1,067,963.81 | $ 10,884.45 | $ 1,078,848.27 | 12/1/2008 | | $ 1,078,848.27 | |
| $ 1,078,848.27 | $ 10,995.39 | $ 1,089,843.65 | 1/1/2009 | | $ 1,089,843.65 | |
| $ 1,089,843.65 | $ 10,032.53 | $ 1,099,876.18 | 2/1/2009 | | $ 1,099,876.18 | |
| $ 1,099,876.18 | $ 11,209.69 | $ 1,111,085.87 | 3/1/2009 | | $ 1,111,085.87 | |
| $ 1,111,085.87 | $ 10,958.66 | $ 1,122,044.53 | 4/1/2009 | | $ 1,122,044.53 | |
| $ 1,122,044.53 | $ 11,435.63 | $ 1,133,480.16 | 5/1/2009 | | $ 1,133,480.16 | |
| $ 1,133,480.16 | $ 11,179.53 | $ 1,144,659.69 | 6/1/2009 | | $ 1,144,659.69 | |
| $ 1,144,659.69 | $ 11,666.12 | $ 1,156,325.81 | 7/1/2009 | | $ 1,156,325.81 | |
| $ 1,156,325.81 | $ 11,785.02 | $ 1,168,110.83 | 8/1/2009 | | $ 1,168,110.83 | |
| $ 1,168,110.83 | $ 11,521.09 | $ 1,179,631.92 | 9/1/2009 | | $ 1,179,631.92 | |

| Initial Promisory Note: | Interest Total to Date: | Total Amount Owed: | | Payments made to Date: | Current Balance Due: | Other Fee's Paid: |
|---|---|---|---|---|---|---|
| $ 1,000,000.00 | $ 639,033.62 | $ 1,639,033.62 | | $ 459,401.70 | $ 1,179,631.92 | $ 35,499.00 |

9.      Thereafter, 3 POINT failed to make required payments on the promissory note. 3 POINT requested that C & C enter into a further agreement dated as of January 31, 2005 which agreement extended the maturity of the note to February 13, 2006 and provided for a release of the original security for the note and substitution of different collateral as well as the payment of $50,000 to C & C to be credited to the principal due on the note. C & C agreed to 3 POINT'S request.

10.     Thereafter, 3 POINT again failed to make required payments of principal and interest on the promissory note as due and owing on the extended note maturity date of February 13, 2006.

11.     Thereafter, 3 POINT acknowledged its default on the note, and requested and received C & C's agreement to forbear from exercising its rights and remedies on the Note until January 31, 2007. A copy of the Consent Waiver and Forbearance agreement dated as of August 3, 2006 and signed by BRUCE BUZIL, co-manager of 3 POINT is attached hereto as Exhibit 5.

12.     No payments of any kind have been made to C & C by 3 POINT since September 29, 2008.

13.     As of the date of filing of this Complaint, 3 POINT has failed to make payments required by the promissory note of $810,065.84 principal.

14.     As a result of the above failure to pay the amounts due and owing in connection with the Promissory Note, 3 POINT owes C & C $810,065.84 in principal and unpaid interest in the amount of $369,566.08

15.     As a result of the failure of 3 POINT to pay the amount due and owing in connection with its repeated promises and representations that it would pay various

amounts to C & C, BRUCE BUZIL and CHRIS DEVINE, as limited guarantors each owe C & C, jointly and severally with 3 POINT and each other, $810,065.84 and unpaid interest in the amount of $369,566.08.

## THE PARTIES

16.   Plaintiff C & C is a Kansas Corporation with its principal place of business located at 2001 Morningside Drive, Emporia, KS 66801.

17.   Defendant 3 POINT is an Illinois Limited Liability Company, with its principal place of business located at 980 North Michigan Avenue, Chicago, IL 60601

18.   Defendant BRUCE BUZIL, is a citizen of the State of Illinois, residing in the Northern District of Illinois at Glencoe, and was at times material to this complaint an owner and co-manager of 3 POINT.

19.   Defendant CHRIS DEVINE is a citizen of the State of Illinois, residing in the Northern District of Illinois at Kenilworth, and was at times material to this complaint an owner and co-manager of 3 POINT.

## JURISDICTION/VENUE

20.   Jurisdiction is appropriate in this court pursuant to 28 U.S.C. §1332(a), as complete diversity of citizenship exists between the Plaintiff and the Defendants and the amount in controversy exceeds $75,000 exclusive of interests and costs.   Venue is appropriate in this court pursuant to 28 U.S.C. §1391 as 3 POINT, BRUCE BUZIL and CHRIS DEVINE are residents of the Northern District of Illinois, the sale of assets occurred in the Northern District of Illinois and the Promissory Note was made in the Northern District of Illinois.

## FACTS

### COUNT I (Breach of Contract: Money Damages)

21.    C & C repeats the allegations in paragraph "1" through "15."

22.    A valid promissory note was provided to C & C by 3 POINT, guaranteed by BRUCE BUZIL and CHRIS DEVINE, in connection with C & C sale of substantially all of its assets to 3 POINT, whereby 3 POINT agreed to make payments of interest to C & C, and to repay the principal loan amount to 3 POINT on or before February 13, 2006.

23.    3 POINT has failed to make required monthly interest payments.    In addition, 3 POINT has failed to repay the principal and the interest due in repeated and continuous breach of the parties' agreement.

24.    C & C has suffered and continues to suffer damages resulting from 3 POINT'S breaches of the parties' Loan agreement.  Specifically, there remains due on the Loan the principal sum of $810,065.84 and interest for the months beginning March 2005 through September 2009 in the amount of $369,566.08.  In addition the Loan accrues an additional and further interest amount equal to 12% annually on the outstanding principal calculated on a year of 365 days.

25.    C & C has done all acts required by it relative to its agreement with 3 POINT, has made repeated demands upon 3 POINT, BRUCE BUZIL AND CHRIS DEVINE to repay the principal and interest.

26.    Pursuant to the Agreement Plaintiff C & C is entitled to recover all reasonable costs and expenses in enforcing the agreement, including attorney's fees.

## COUNT II (Costs and Expenses)

27.    C & C repeats the allegations in paragraphs "1" through "15."

28.    The promissory note, provides that C & C is entitled to recover all reasonable costs and expenses in enforcing the loan agreement, including reasonable attorneys' fees.

29.    By reason of the foregoing, C & C is entitled to a money judgment for its costs and expenses incurred in enforcing his rights under the Loan agreement, including without limitation the costs and disbursements of this action, including reasonable attorneys' fees.

30.    C & C demands trial by jury on all claims.

## PRAYER FOR RELIEF

31.    Plaintiff C & C respectfully requests that this Court enter judgment as follows:

A.    Enter judgment in favor of Plaintiff C & C and against Defendants 3 POINT, BRUCE BUZIL, AND CHRIS DEVINE in the amount of $1,179,631.92, plus additional interest at the rate in the agreement until paid;

B.    An award of costs and attorney fees incurred by Plaintiff C & C in collection of the amounts owed to Plaintiff C & C; and

C.    Such other and further relief as this Court deems just and appropriate.

Date:                                    Plaintiff  C & C CONSULTING, INC.


                                         By: /s/ Dean J. Polales
                                         Dean J. Polales (ARDC #03125505
                                         Richard H. Tilghman IV (ARDC #6287541)
                                         Ungaretti & Harris, LLP
                                         3500 Three First National Plaza
                                         Chicago, Illinois 60602
                                         Telephone:  (312) 977-4400
                                         Facsimile:  (312) 977-4405

                                         *Counsel for Plaintiff C & C Consulting, Inc.*

**EXHIBIT 1**
**PROMISSORY NOTE**

**THE SECURITY REPRESENTED HEREBY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE OFFERED OR SOLD IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND SUCH STATE SECURITIES LAWS, OR AN EXEMPTION FROM REGISTRATION THEREUNDER.**

**PROMISSORY NOTE**

**OF**

**3 POINT MEDIA- KANSAS, LLC**

Chicago, Illinois

$1,000,000.00                                                  **February 13, 2004**

    **FOR VALUE RECEIVED**, 3 Point Media – Kansas, LLC, an Illinois limited liability company ("Maker"), hereby promises to pay to C & C Consulting, Inc., a Kansas corporation, or its assigns ("Payee"), the aggregate principal sum of **ONE MILLION DOLLARS ($1,000,000.00)** on the dates set forth below, and to pay to Payee interest on the unpaid principal balance hereof at the rate and times set forth herein.

    1.   Reference to Asset Purchase Agreement.   This Promissory Note (the "Note") is being issued and delivered by Maker to Payee pursuant to the terms of that certain Asset Purchase Agreement dated as of May 7, 2003, as amended on February 13, 2004 (the "Purchase Agreement") between Maker and Payee. Terms used and not otherwise defined herein shall have the meanings set forth in the Purchase Agreement.

    2.   Payment of Principal.  The principal amount of this Note, together with all unpaid interest accrued on such amount, is due and payable upon (a) the twenty-four (24) month anniversary date of the Closing Date ("Maturity Date"); or (b) the sale of either the license or substantially all of the assets of Station KKYD (formerly KANS-FM), FCC Facility No. 7946 (the "Station").

    3.   Payment of Interest.

        (a)   Interest Rate.  The unpaid principal balance due hereunder shall bear interest at an annual rate equal to ten percent (10%), calculated on the basis of a year consisting of 365 days.

(b)     <u>Default Interest Rate</u>. Notwithstanding Section 3(a), in the event of Default and during the continuance of a Default (as herein defined), the principal balance of this Note to which the Default applies shall bear interest at the rate of twelve percent (12%), calculated on the basis of a year consisting of 365 days.

(c)     <u>Payment</u>. Interest shall be due and paid to Payee on a monthly basis beginning on March 1, 2004 and on the first day of each month thereafter.

4.     <u>Prepayment</u>. Maker may, at its option at any time and from time to time hereafter, prepay, in whole or in part, without premium or penalty, the outstanding principal amount of this Note, together with accrued but unpaid interest on such principal amount to the date of prepayment.

5.     <u>Defaults</u>. Maker shall be deemed in default hereunder upon the occurrence of any of the following (a "Default"):

(a)     <u>Failure to Pay Principal</u>. The failure of Maker to pay Payee within five business days of its due date the monthly payment of interest due under Section 3(c), or within five (5) business days of the Maturity Date the principal and interest due hereunder; or

(b)     <u>Bankruptcy, etc.</u> Maker shall have entered against it by a court having jurisdiction thereof a decree or order for relief in respect to Maker in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar official shall be appointed for Maker or for any substantial part of Maker's property, or the winding up or liquidation of Maker's affairs shall have been ordered; or Maker shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; or consent to the entry of an order for such relief in an involuntary case under any such law, or any such involuntary case shall commence, and not be dismissed within sixty (60) days, or Maker shall consent to the appointment of or taking possession by a receiver, liquidator, assignee or trustee of all or substantially all of Maker's property, or make any general assignment for the benefit of creditors.

(c)     <u>Default under Security Agreement</u>. Any Default under that certain Security Agreement dated as of the date hereof between Maker and Payee.

6.     <u>Consequence of Default</u>. Upon the occurrence of a Default that is not cured by the Maker within five (5) business days of receiving written notice from Payee of such a Default, the entire then unpaid principal balance hereof and all interest then accrued and unpaid thereon and all other sums payable hereunder shall, at the option of Payee at any time after a Default has occurred and is continuing, become immediately due and payable. In the event of Default which is not timely cured, Payee can exercise its rights under the Security Agreement and Limited Guaranty dated as of the date hereof, and in addition, Maker agrees to act reasonably and in good faith to effect an orderly assignment of the Station license to Payee.

2

7. <u>Security Interest</u>. This Note is secured by a security interest in the Purchased Assets (excluding licenses and permits issued by the FCC to the extent, and only to the extent, it is unlawful to grant a security interest in such licenses and permits, but including, to the maximum extent permitted by law, all rights incident or appurtenant to such licenses and permits, including, without limitation, the right to receive all proceeds derived from or in connection with the sale, assignment or transfer of such licenses and permits) and certain other assets as specified in and in accordance with the terms of that certain Security Agreement dated as of the date hereof.

8. <u>Miscellaneous</u>.

(a)    Principal and interest due hereunder shall be payable in lawful money of the United States of America and shall be payable to Payee at the address of Payee, or at such other address as may be specified in a written notice to Maker given by Payee.

(b)    If any payment on this Note shall become due on a Saturday, Sunday or a bank or legal holiday, such payment shall be due on the next succeeding business day.

(c)    No delay or omission on the part of Payee in the exercise of any right or remedy hereunder shall operate as a waiver thereof, and no partial exercise of any right or remedy precludes other or further exercise thereof or the exercise of any other rights or remedy.

(d)    If a Default shall occur under this Note, Maker shall pay on demand all reasonable costs and expenses of collection of Payee, including reasonable attorneys' fees.

(e)    Maker hereby waives presentment, protest and demand, notice of protest, demand and dishonor and non-payment of this Note.

(f)    If interest payable under this Note is in excess of the maximum permitted by law, the interest chargeable hereunder shall be reduced to the maximum amount permitted by law and any excess over the maximum amount permitted by law shall be credited to the principal balance of this Note and applied to the same and not to the payment of interest.

(g)    This Note shall be governed and construed in accordance with the internal laws of the State of Kansas, without regard to any conflict of laws provisions.

MAKER: 3 POINT MEDIA – KANSAS, LLC

By:  _____
Bruce Buzil, Co-Manager

3

**EXHIBIT 2**
**LIMITED GUARANTY**

## LIMITED GUARANTY

**GUARANTY**, dated as of February 13, 2004, made by each person listed on the signature pages hereto (each a "Guarantor" and collectively, the "Guarantors"), in favor of C&C Consulting, Inc. (the "Seller").

**WHEREAS**, 3 Point Media - Kansas, LLC ("Maker") executed a Promissory Note (the "Note") as of even date herewith, pursuant to which Maker has promised to pay to Seller the principal sum of $1,000,000.00, due and payable pursuant to the terms and conditions set forth in the Note.

**WHEREAS**, the Bruce Buzil and Chris Devine are the managers and or own membership interests in the Maker, and therefore Guarantors expect to receive substantial direct and indirect benefits as a result of the delivery and performance of the Note (which benefits are hereby acknowledged).

**WHEREAS**, Lakeshore Media, LLC is a company owned in part by Bruce Buzil and Chris Devine, and is the owner of various assets.

**WHEREAS**, it is a condition to Seller's willingness to accept the Note that Guarantors shall have guaranteed, subject to the terms hereof, that all the obligations of Maker under the Note, including, without limitation, that timely payment under the Note of (i) the principal; (ii) the Interest Payments as defined in the Note; and (iii) the penalty and default obligations under the Note (the "Guaranteed Obligations"), be paid when due as set forth in the Note.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantors agree as follows:

1.        Subject to Section 10 hereof, the Guarantors jointly and severally, hereby irrevocably guarantee the payment in full of the Guaranteed Payments when due as set forth in the Note.

2.        Guarantors hereby represent and warrant to Seller (which representations and warranties shall survive the delivery of this Limited Guaranty) that:

(a)      The Limited Guaranty has been duly and validly executed and delivered by the Guarantors and constitutes the legal, valid and binding obligation of the Guarantors, enforceable against the Guarantors in accordance with its terms, except (i) as may be limited by applicable bankruptcy, insolvency, moratorium and other similar laws affecting creditors generally, and (ii) that the availability of the remedy of specific enforcement or of injunctive relief is subject to the discretion of the court before which proceedings therefor may be brought.

(b)      The execution and delivery of, and performance by the Guarantors of their obligations under this Limited Guaranty do not and will not violate any provision of law, any order, judgment or decree of any court or other agency of government, to which either Guarantor is a party, or by which either Guarantor is bound, or be in conflict with, result in a breach of, or

1

constitute (with due notice or lapse of time or both) a default under, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of either Guarantor pursuant to, any such indenture, agreement or instrument except where such violation, conflict or default would not have a material adverse effect on the properties, assets or condition (financial or otherwise) of Guarantor.

(c)     The Guarantors each separately and individually have in their own names, and will keep in their own names until the note is paid in full, sufficient assets (beyond those referred to in paragraph 10 below) to satisfy the Guaranteed Obligations.

3.     Guarantors expressly waive (i) presentment and demand for payment and protest of nonpayment, (ii) notice of acceptance of this Limited Guaranty and protest of nonpayment, and (iii) notice of any default hereunder or under the Note.

4.     Guarantors waive any right to require Seller to (a) proceed against Maker; (b) proceed against or exhaust any security held from Maker; or (c) pursue any other remedy in Seller's power whatsoever.

5.     The Guarantors shall be in default under this Limited Guaranty (an "Event of Default") upon the failure of the Guarantors to perform or comply with any material term or covenant contained in this Limited Guaranty, which default shall continue unremedied for ten (10) business days after written notice from Seller to both Guarantors;

6.     Any notice required or permitted by this Limited Guaranty shall be in writing and shall be deemed sufficient upon receipt, when delivered personally or by courier, overnight delivery service or confirmed facsimile, or forty-eight (48) hours after being deposited in the regular mail as certified or registered mail with postage prepaid, if such notice is addressed to the party to be notified at such party's address, or party refused to accept delivery, or facsimile number as set forth below, or as subsequently modified by written notice.

If to Seller:

Edward A. Lipson
C & C Consulting, Inc.
1811 West 6th Avenue
Emporia, KS 66801
Facsimile: 620-342-7617

2

With a copy (which shall not constitute notice) to:

        Dan J. Alpert, Esq.
        Law Office of Dan J. Alpert
        2120 North 21st Road
        Arlington, VA 22201
        Fax Number: (703) 243-8692
        E-Mail: dja@commlaw.tv

If to Buyer:

        3 Point Media-Kansas, LLC
        980 North Michigan Ave.
        Suite 1880
        Chicago, IL 60611
        bbuzil@marathonmedia.com

With a copy (which shall not constitute notice) to:

        Robert E. Neiman, Esq.
        Greenberg Traurig
        77 West Wacker Dr.
        Suite 2500
        Chicago, IL 60601
        neimanr@gtlaw.com

To Guarantors:      Bruce Buzil and Chris Devine
        980 N. Michigan Ave.
        Suite 1880
        Chicago, IL 60011

    7.      Subject to Section 1 hereof, Guarantors agree to pay all costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred in connection with any collection under this Limited Guaranty.

    8.      Any payments made by the Guarantors under the provisions of this Limited Guaranty shall be made to Seller at the address set forth above unless some other address is hereafter designated by notice in writing in accordance with Section 6 hereof by Seller.

    9.      Except as otherwise provided for in Section 1 of this Limited Guaranty, this Limited Guaranty is a continuing Guaranty and shall remain in full force and effect until the indefeasible payment in full in cash of the obligations under the Note or the termination, forgiveness or cancellation by Seller and Maker of the Note.

    10.    Notwithstanding anything to the contrary contained in this Guaranty, Seller shall have no rights to or against and this Guaranty specifically excludes the real estate, buildings, and fixtures owned by Bruce A. Buzil and located at or in _____, Glencoe, Illinois, 60022 and _____ Scottsdale, Arizona, 85262 or against the real estate,

3

buildings, and fixtures owned by Christopher F. Devine and located at or
Winnetka, Illinois, 60035, and                    Salt Lake City, Utah, 84103.

11.     This Limited Guaranty shall be construed in accordance with the laws of the State
of Illinois, without regard to the choice of law rules thereof.

12.     This Limited Guaranty is not assignable and shall be binding upon and inure to
the benefit of the parties, their successors, heirs and personal representatives.

13.     In case this Limited Guaranty or any one or more of the provisions contained
herein shall for any reason be held to be invalid, illegal or unenforceable in any respect, such
invalidity, illegality or shall not affect any other provision thereof, and this Limited Guaranty
shall be construed as if such invalid, illegal or unenforceable provision had never been included.

[Signature Page Follows]

4

IN WITNESS WHEREOF, each Guarantor has executed this Limited Guaranty as of the day and year first above written.

_____
Bruce Buzil

_____
Christopher Devine

**LAKESHORE MEDIA, LLC**

By: _____
      Bruce Buzil, Member

[Signature Page to Guaranty of Buzil and Devine]

5

**IN WITNESS WHEREOF**, each Guarantor has executed this Limited Guaranty as of the day and year first above written.

_____
Bruce Buzil

_____
Christopher Devine

**LAKESHORE MEDIA, LLC**

By: _____
Bruce Buzil, Member

[Signature Page to Guaranty of Buzil and Devine]

5

**EXHIBIT 3**
**CLOSING SETTLEMENT STATEMENT**

**CLOSING SETTLEMENT STATEMENT**
**PAYOFFS GOOD THROUGH FEBRUARY 13, 2004**

**1. KKYD Closing**

    1)    **Section 3.1: Purchase Price:** $1,300,000

    2)    **Section 12.1 Penalty:** $750.00 for each day beyond designated Closing Date that Closing does not occur.

    Under Section 12.1 of the APA, the Closing of the transactions shall take place no later than 10 business days after written approval from FCC, and such approval has become final. The KKYD assignment was granted on August 12, 2003; it was published as a Public Notice on August 15, 2003, and become final at the close of business on September 24, 2003. Closing was to occur ten business days thereafter, on October 8, 2003. To summarize:

    Grant Date:    8/12/2003
    Finality:    9/24/2003
    10 business days later: 10/8/2003

    Penalty: 128 days, $750 per day, for a total of $96,000.00

**TOTAL OWED TO C&C CONSULTING, INC. AT CLOSING**

                          **$1,396,000.00**

**2. Payment**

    Promissory Note:  **$1,000,000**

    Escrow            $10,000.00

    Credits:         $50,000 (per Section 3.3(b) of APA)
                      $1,000 (previous payment)

    Cash:           $300,000.00

    Payments Over Time:
        $8,750/per month:   $35,000.00
        beginning 3/1/2004

**TOTAL: $1,396,000.00**

Wire Instructions:

Lyon County State Bank
Account :    8002
Name:  C & C Consulting, Inc.
ABA # 101100786

**AGREED:**

**3 POINT MEDIA – KANSAS, LLC**

By: _____
Name: Bruce Buzil
Title:  Manager

**C&C CONSULTING, INC.**

By: _____
Name: Edward Lipson
Title:  President

**AGREED:**

**3 POINT MEDIA – KANSAS, LLC**

By: _____
     Name:  Bruce Buzil
     Title:   Manager

**C&C CONSULTING, INC.**

By: _____
     Name:  Edward Lipson
     Title:  President

**EXHIBIT 4**
**SUBORDINATON AND INTERCREDITOR AGREEMENT**

## SUBORDINATION AND INTERCREDITOR AGREEMENT

THIS SUBORDINATION AND INTERCREDITOR AGREEMENT (this "Agreement") is entered into as of February 13, 2004, by and among C & C CONSULTING, INC., a Kansas corporation, ("Subordinated Creditor"), 3 POINT MEDIA – KANSAS, LLC, an Illinois limited liability company (the "Company"), and MONROE CAPITAL FUNDING, LLC, an Illinois limited liability company (together with any lender under any Permitted Refinancing Senior Debt Document, the "Lender").

### R E C I T A L S :

A.      The Company and Lender have entered into a Credit Agreement of even date herewith (as the same may be amended, restated, supplemented or otherwise modified from time to time as permitted hereunder, the "Senior Credit Agreement"), pursuant to which, among other things, Lender has agreed, subject to the terms and conditions set forth in the Senior Credit Agreement, to make certain loans and financial accommodations to the Company. All of the Company's obligations to Lender under the Senior Credit Agreement and the other Senior Debt Documents (as hereinafter defined) are secured by liens on and security interests in substantially all of the now existing and hereafter acquired real and personal property of the Company (the "Collateral").

B.      The Company and Subordinated Creditor entered into an Asset Purchase Agreement dated as of May 7, 2004, as amended (as the same may be amended, restated, supplemented or otherwise modified from time to time as permitted hereunder, the "Asset Purchase Agreement"), pursuant to which Subordinated Creditor has extended credit to the Company as evidenced by a Promissory Note dated February 13, 2004 in the principal amount of $1,000,000 (such Promissory Note, and any notes issued in substitution therefor from time to time as permitted hereunder, the "Subordinated Note").

C.      As an inducement to and as one of the conditions precedent to the agreement of Lender to consummate the transactions contemplated by the Senior Credit Agreement, Lender has required the execution and delivery of this Agreement by Subordinated Creditor and the Company in order to set forth the relative rights and priorities of Lender and Subordinated Creditor under the Senior Debt Documents and the Subordinated Debt Documents (as hereinafter defined).

NOW, THEREFORE, in order to induce Lender to consummate the transactions contemplated by the Senior Credit Agreement, and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto hereby agree as follows:

1.      **Definitions.** All capitalized terms used but not elsewhere defined in this Agreement shall have the respective meanings ascribed to such terms in the Credit Agreement (or in the Permitted Refinancing Senior Debt Documents, as defined below, after the occurrence of a Permitted

1

Doc #:CHI02 (213395-00007) 602441694v1;01/29/2004/Time:23:07

Refinancing, as defined below). The following terms shall have the following meanings in this Agreement:

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"**Distribution**" means, with respect to any indebtedness, (a) any payment or distribution by any Person of cash, securities or other property, by set-off or otherwise, on account of such indebtedness or obligation, (b) any redemption, purchase or other acquisition of such indebtedness or obligation by any Person or (c) the granting of any lien or security interest to or for the benefit of the holders of such indebtedness or obligation in or upon any property of any Person.

"**Enforcement Action**" shall mean (a) to take from or for the account of the Company or any guarantor of the Subordinated Debt, by set-off or in any other manner, the whole or any part of any moneys which may now or hereafter be owing by the Company or any such guarantor with respect to the Subordinated Debt, (b) to sue for payment of, or to initiate or participate with others in any suit, action or proceeding against the Company or any such guarantor to (i) enforce payment of or to collect the whole or any part of the Subordinated Debt or (ii) commence judicial enforcement of any of the rights and remedies under the Subordinated Debt Documents or applicable law with respect to the Subordinated Debt, (c) to accelerate the Subordinated Debt, (d) to exercise any put option or to cause the Company or any such guarantor to honor any redemption or mandatory prepayment obligation under any Subordinated Debt Document or (e) take any action under the provisions of any state or federal law, including, without limitation, the Uniform Commercial Code, or under any contract or agreement, to enforce, foreclose upon, take possession of or sell any property or assets of the Company or any such guarantor.

"**Loan Documents**" means, collectively, the Senior Credit Agreement, the promissory note issued by Company to Lender under the Credit Agreement, this Agreement, the Escrow Agreement, the Borrower Security Agreement, the Borrower Pledge Agreement, the Superior Security Agreement, the Principal Pledge Agreement, the Guaranty and any other agreement, document or instrument, including, without limitation, all other security agreements, pledge agreements, patent and trademark assignments, lease assignments, guarantees and similar agreements, and all amendments, restatements, modifications and supplements thereof or thereto, pursuant to which the Company, any Subsidiary of the Company or any other Person grants Collateral, Liens and/or security interests to the Lender or guarantees the payment and performance of the Obligations, and all other agreements, documents and instruments delivered to the Lender in connection herewith and therewith.

"**Paid in Full**" or "**Payment in Full**" shall mean the indefeasible payment in full in cash of all Senior Debt and termination of all commitments to lend under the Loan Documents and Permitted Refinancing Senior Debt Documents.

2

"**Permitted Refinancing**" shall mean any refinancing of the Senior Debt under the Loan Documents provided that the financing documentation entered into by the Company in connection with such Permitted Refinancing constitute Permitted Refinancing Senior Debt Documents.

"**Permitted Refinancing Senior Debt Documents**" shall mean any financing documentation which replaces the Loan Documents and pursuant to which the Senior Debt under the Loan Documents are refinanced, as such financing documentation may be amended, restated, supplemented or otherwise modified from time to time in compliance with this Agreement, but specifically excluding any such financing documentation to the extent that it contains, either initially or by amendment or other modification, any material terms, conditions, covenants or defaults other than those which (a) then exist in the Loan Documents or (b) could be included in the Loan Documents by an amendment or other modification that would not be prohibited by the terms of this Agreement.

"**Permitted Subordinated Debt Payments**" means (i) payments of regularly scheduled payments of interest on the Subordinated Debt and (ii) payment of the principal amount of the Subordinated Debt on the regularly scheduled, non-accelerated maturity date of the Subordinated Note, in each case as due and payable in accordance with the terms of the Subordinated Debt Documents as in effect on the date hereof or as modified in accordance with the terms of this Agreement .

"**Person**" means any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other entity, whether acting in an individual, fiduciary or other capacity.

"**Proceeding**" shall mean any voluntary or involuntary insolvency, bankruptcy, receivership, custodianship, liquidation, dissolution, reorganization, assignment for the benefit of creditors, appointment of a custodian, receiver, trustee or other officer with similar powers or any other proceeding for the liquidation, dissolution or other winding up of a Person.

"**Senior Debt**" shall mean all obligations, liabilities and indebtedness of every nature of the Company from time to time owed to Lender under the Senior Debt Documents, including, without limitation, the principal amount of all debts, claims and indebtedness, accrued and unpaid interest and all fees, costs and expenses, whether primary, secondary, direct, contingent, fixed or otherwise, heretofore, now and from time to time hereafter owing, due or payable, whether before or after the filing of a Proceeding under the Bankruptcy Code together with (a) any amendments, modifications, renewals or extensions thereof to the extent not prohibited by the terms of this Agreement and (b) any interest accruing thereon after the commencement of a Proceeding, without regard to whether or not such interest is an allowed claim.

"**Senior Debt Documents**" shall mean the Loan Documents and, after the consummation of any Permitted Refinancing, the Permitted Refinancing Senior Debt Documents.

"**Senior Default**" shall mean any "Unmatured Event of Default" or "Event of Default" under the Senior Debt Documents.

"**Subordinated Debt**" shall mean all of the obligations of the Company to Subordinated Creditor evidenced by or incurred pursuant to the Subordinated Debt Documents.

"**Subordinated Debt Documents**" shall mean the Asset Purchase Agreement, the Subordinated Note, the Subordinated Security Agreement, any guaranty with respect to the Subordinated Debt, and all other documents, agreements and instruments now existing or hereinafter entered into evidencing or pertaining to all or any portion of the Subordinated Debt.

"**Subordinated Debt Default**" shall mean a default in the payment of the Subordinated Debt or in the performance of any term, covenant or condition contained in the Subordinated Debt Documents or any other occurrence permitting Subordinated Creditor to accelerate the payment of, put or cause the redemption of, all or any portion of the Subordinated Debt or any Subordinated Debt Document.

"**Subordinated Security Agreement**" shall mean that certain Security Agreement dated as of February 13, 2004 between Subordinated Creditor and Company, as the same is in effect on the date hereof.

2.    **Subordination.**

2.1    **Subordination of Subordinated Debt to Senior Debt.** The Company covenants and agrees, and Subordinated Creditor by its acceptance of the Subordinated Debt Documents (whether upon original issue or upon transfer or assignment) likewise covenants and agrees, notwithstanding anything to the contrary contained in any of the Subordinated Debt Documents, that the payment of any and all of the Subordinated Debt shall be subordinate and subject in right and time of payment to the Senior Debt to the extent and in the manner hereinafter set forth. Each holder of Senior Debt, whether now outstanding or hereafter created, incurred, assumed or guaranteed, shall be deemed to have acquired Senior Debt in reliance upon the provisions contained in this Agreement.

2.2    **Liquidation, Dissolution, Bankruptcy.** In the event of any Proceeding involving the Company:

(a)    All Senior Debt shall first be Paid in Full before any Distribution, whether in cash, securities or other property, shall be made to Subordinated Creditor on account of any Subordinated Debt.

4

(b)     Any Distribution, whether in cash, securities or other property which would otherwise, but for the terms hereof, be payable or deliverable in respect of the Subordinated Debt shall be paid or delivered directly to Lender (to be held and/or applied by Lender in accordance with the terms of the Senior Debt Documents) until all Senior Debt is Paid in Full. Subordinated Creditor irrevocably authorizes, empowers and directs any debtor, debtor in possession, receiver, trustee, liquidator, custodian, conservator or other Person having authority, to pay or otherwise deliver all such Distributions to Lender. Subordinated Creditor also irrevocably authorizes and empowers Lender, in the name of Subordinated Creditor, to demand, sue for, collect and receive any and all such Distributions.

(c)     Subordinated Creditor agrees not to initiate, prosecute or participate in any claim, action or other proceeding challenging the enforceability, validity, perfection or priority of the Senior Debt or any liens and security interests securing the Senior Debt.

(d)     Subordinated Creditor agrees to execute, verify, deliver and file any proofs of claim in respect of the Subordinated Debt requested by Lender in connection with any such Proceeding and hereby irrevocably authorizes, empowers and appoints Lender its agent and attorney-in-fact to (i) execute, verify, deliver and file such proofs of claim upon the failure of Subordinated Creditor promptly to do so prior to 10 business days before the expiration of the time to file any such proof of claim and (ii) vote such claim in any such Proceeding upon the failure of Subordinated Creditor to do so prior to 5 business days before the expiration of the time to vote any such claim; provided Lender shall have no obligation to execute, verify, deliver, file and/or vote any such proof of claim. In the event that Lender votes any claim in accordance with the authority granted hereby, Subordinated Creditor shall not be entitled to change or withdraw such vote.

(e)     The Senior Debt shall continue to be treated as Senior Debt and the provisions of this Agreement shall continue to govern the relative rights and priorities of Lender and Subordinated Creditor even if all or part of the Senior Debt or the security interests securing the Senior Debt are subordinated, set aside, avoided, invalidated or disallowed in connection with any such Proceeding, and this Agreement shall be reinstated if at any time any payment of any of the Senior Debt is rescinded or must otherwise be returned by any holder of Senior Debt or any representative of such holder.

(f)     Notwithstanding anything to the contrary contained in this Section 2.2, Subordinated Creditor shall be permitted to retain Permitted Subordinated Debt Payments received by Subordinated Creditor in accordance with the terms and conditions of this Agreement prior to the initiation of a Proceeding unless such payments are required to be returned to the Company or any trustee or receiver appointed for Company as required by law in connection with such Proceeding, in which case such returned payments shall be subject to the terms and provisions hereof.

5

**2.3    Subordinated Debt Payment Restrictions.**

(a)    Notwithstanding the terms of the Subordinated Debt Documents, the Company hereby agrees that it may not make, and Subordinated Creditor hereby agrees that it will not accept, any Distribution with respect to the Subordinated Debt until the Senior Debt is Paid in Full other than Permitted Subordinated Debt Payments, subject to the terms of subsection 2.2 of this Agreement; provided, however, that the Company and Subordinated Creditor further agree that no Permitted Subordinated Debt Payment may be made by the Company or accepted by Subordinated Creditor if, at the time of such payment, a Senior Default exists or would be created by the making of such payment. Notwithstanding the foregoing, with respect solely to Permitted Subordinated Debt Payments received by the Subordinated Creditor, Subordinated Creditor shall not be in violation of this Section 2.3(a) unless Subordinated Creditor shall have received written notice that a Senior Default exists or would be created by the making of or accepting of such payment.

(b)    The Company may resume Permitted Subordinated Debt Payments (and may make any Permitted Subordinated Debt Payments missed due to the application of paragraph (a) of this subsection 2.3) in respect of the Subordinated Debt upon the cure or waiver of all existing Senior Defaults in accordance with the provisions of the Senior Debt Documents.

(c)    No Senior Default of which Subordinated Creditor has been given written notice shall be deemed to have been waived for purposes of this subsection 2.3 unless and until the Company shall have received a written waiver from Lender.

**2.4    Subordinated Debt Standstill Provisions.** Until the Senior Debt is Paid in Full, Subordinated Creditor shall not, without the prior written consent of Lender, take any Enforcement Action with respect to the Subordinated Debt. Notwithstanding the foregoing, Subordinated Creditor may file proofs of claim against the Company in any Proceeding involving the Company. Any Distributions or other proceeds of any Enforcement Action obtained by Subordinated Creditor shall in any event be held in trust by it for the benefit of Lender and promptly paid or delivered to Lender in the form received until all Senior Debt is Paid in Full.

Anything contained in this Section 2.4 to the contrary notwithstanding, to the extent any Permitted Subordinated Debt Payment is missed or otherwise not made by the Company to Subordinated Creditor when and as due, and such payment otherwise shall have been permitted to be made by the Company to the Subordinated Creditor under this Agreement at such time, then such Subordinated Creditor, upon at least three (3) business days' prior written notice to the Lender of its intent to do so, may bring and maintain a collection action against the Company or any guarantor of the Subordinated Debt solely for the purpose of collecting such payment (but in no event shall Subordinated Creditor be permitted to institute a Proceeding) and, to the extent payments in respect of Subordinated Debt otherwise are not then prohibited or otherwise are not being blocked under Section 2.3 hereof, Subordinated Creditor may receive and retain such payment upon recovery thereof.

6

**2.5    Incorrect Payments.** If any Distribution on account of the Subordinated Debt not permitted to be made by the Company or accepted by Subordinated Creditor under this Agreement is made and received by Subordinated Creditor, such Distribution shall not be commingled with any of the assets of Subordinated Creditor, shall be held in trust by Subordinated Creditor for the benefit of Lender and shall be promptly paid over to Lender for application (in accordance with the Senior Debt Documents) to the payment of the Senior Debt then remaining unpaid, until all of the Senior Debt is Paid in Full.  Notwithstanding the foregoing, with respect solely to Permitted Subordinated Debt Payments received by the Subordinated Creditor, Subordinated Creditor shall not be in violation of this Section 2.5 unless Subordinated Creditor shall have received written notice that a Senior Default exists or would be created by the making of or accepting of such payment or a Proceeding has been commenced.

**2.6    Subordination of Liens and Security Interests; Agreement Not to Contest; Agreement to Release Liens.** Until the Senior Debt has been Paid in Full, any liens and security interests of Subordinated Creditor in the Collateral shall be and hereby are subordinated for all purposes and in all respects to the liens and security interests of Lender in the Collateral, regardless of the time, manner or order of perfection of any such liens and security interests. Subordinated Creditor agrees that it will not at any time contest the validity, perfection, priority or enforceability of the Senior Debt, the Senior Debt Documents, or the liens and security interests of Lender in the Collateral securing the Senior Debt. In the event that Subordinated Creditor obtains any liens or security interests in the Collateral other than those obtained under the Subordinated Security Agreement, Subordinated Creditor shall (or shall cause its agent) to promptly execute and deliver to Lender such termination statements and releases as Lender shall request to effect the release of the liens and security interests of Subordinated Creditor in such Collateral. In furtherance of the foregoing, Subordinated Creditor hereby irrevocably appoints Lender its attorney-in-fact, with full authority in the place and stead of Subordinated Creditor and in the name of Subordinated Creditor or otherwise, to execute and deliver any document or instrument which Subordinated Creditor may be required to deliver pursuant to this subsection 2.6.

Notwithstanding the foregoing, but subject in all circumstances to the provisions of Section 2.9 hereof, Subordinated Creditor shall be permitted to perfect its security interest in the Collateral subject to the Subordinated Security Agreement.

**2.7    Sale, Transfer or other Disposition of Subordinated Debt.**

(a)    Subordinated Creditor shall not sell, assign, pledge, dispose of or otherwise transfer all or any portion of the Subordinated Debt or any Subordinated Debt Document: (i) without giving prior written notice of such action to Lender, (ii) unless, prior to the consummation of any such action, the transferee thereof shall execute and deliver to Lender an agreement substantially identical to this Agreement, providing for the continued subordination of the Subordinated Debt to the Senior Debt as provided herein and for the continued effectiveness of all of the rights of Lender arising under this Agreement and (iii) unless, following the consummation of any such action, there shall be no more than three holders of the Subordinated Debt.

7

(b)     Notwithstanding the failure of any transferee to execute or deliver an agreement substantially identical to this Agreement, the subordination effected hereby shall survive any sale, assignment, pledge, disposition or other transfer of all or any portion of the Subordinated Debt, and the terms of this Agreement shall be binding upon the successors and assigns of Subordinated Creditor, as provided in Section 9 hereof.

**2.8**     <u>Legends</u>. Until the termination of this Agreement in accordance with Section 15 hereof, Subordinated Creditor will cause to be clearly, conspicuously and prominently inserted on the face of the Subordinated Note and any other Subordinated Debt Document, as well as any renewals or replacements thereof, the following legend:

"This instrument and the rights and obligations evidenced hereby are subordinate in the manner and to the extent set forth in that certain Subordination and Intercreditor Agreement (as the same may be amended or otherwise modified from time to time pursuant to the terms thereof, the "Subordination Agreement") dated as of February 13, 2004 among C & C Consulting, Inc., a Kansas corporation, 3 Point Media – Kansas, LLC, an Illinois limited liability company (the "Company"), and Monroe Capital Funding, LLC ("Lender"), to the indebtedness (including interest) owed by the Company pursuant to that certain Credit Agreement dated as of February 13, 2004 between the Company and Lender, as such Credit Agreement may be amended, restated, supplemented or otherwise modified from time to time as permitted under the Subordination Agreement and to indebtedness refinancing the indebtedness under that agreement as permitted by the Subordination Agreement; and each holder of this instrument, by its acceptance hereof, irrevocably agrees to be bound by the provisions of the Subordination Agreement."

**2.9**     <u>Lien Subordination.</u>

(a)     Notwithstanding the absence, order or time of attachment, or the absence, order, time or manner of perfection, or the absence, order or time of filing or recordation of any document or instrument or taking possession of collateral or other method of creating and/or perfecting a Lien, and notwithstanding any terms or conditions to the contrary which may be contained in the Uniform Commercial Code or other applicable law or any other document or agreement, the Liens securing the Senior Debt ("Senior Liens") have and shall have a priority senior to all Liens granted to Subordinated Creditor under the Subordinated Security Agreement and any other Liens securing Subordinated Debt (collectively, "Subordinated Liens") and such Subordinated Liens are and shall be, in all respects, subject and subordinate to the Senior Liens to the full extent of the Senior Debt outstanding from time to time. To the extent requested by the Lender, Subordinated Creditor and Company shall, at the cost and expense of Company, execute and file of record such documents and agreements, including UCC amendments amending their respective financing statements, to reflect the priorities established herein. For avoidance of doubt, the Lien subordination and priorities set forth herein shall apply notwithstanding that the Senior Liens shall not be enforceable or shall not have attached or been perfected.

8

(b)     The Lien priorities provided in this subsection 2.9 shall not be altered or otherwise affected by (i) any amendment, modification, supplement, extension, renewal, restatement or refinancing of any Senior Debt, (ii) any action or inaction which Lender may take or fail to take in respect of any Lien or any Collateral secured or (iii) the invalidity or unenforceability of any Senior Debt or any Senior Liens.

(c)     Until the Senior Debt has been paid in full, Lender shall have the exclusive right to manage, perform and enforce the terms of the Senior Debt and Loan Documents or Permitted Refinancing Senior Debt Documents with respect to all Collateral and to exercise and enforce all privileges and rights thereunder according to its sole discretion, including, without limitation, the exclusive right to take or retake control or possession of the Collateral and to hold, prepare for sale, process, sell, lease, foreclose upon, collect, exercise rights or remedies with respect to, dispose of, or liquidate the Collateral and Subordinated Creditor will not take or seek to take any such action. In connection therewith, Subordinated Creditor waives any and all rights to affect the method or challenge the appropriateness of any action by Lender, or any right to object to a strict foreclosure, waives any and all rights of redemption and hereby consents to Lender dealing with the Collateral as if no Subordinated Liens existed; provided Subordinated Creditor reserves the right to enforce any claims it may have under the Uniform Commercial Code due to the Lender conducting a foreclosure sale in a manner that is not commercially reasonable as determined in accordance with the terms thereof. Except as specifically set forth in the proviso to the preceding sentence, Subordinated Creditor waives any rights it may have against Lender due to a loss caused by a failure to comply with the default provisions of the Uniform Commercial Code.

(d)     Subordinated Creditor will, immediately upon the request of Lender, release or otherwise terminate any of its Liens upon the Collateral, to the extent such Collateral is sold or otherwise disposed of either by Lender, or by Company as permitted by the Loan Documents or Permitted Refinancing Senior Debt Documents or otherwise with the consent of Lender or the requisite holders of Senior Debt (or any representative thereof) and Subordinated Creditor will immediately deliver such release documents as Lender may require in connection therewith. In furtherance of the foregoing, Subordinated Creditor hereby irrevocably appoints Lender as its lawful attorney and agent to execute any and all such release documents (including, without limitation, UCC termination statements) and to record and/or file such release documents as Lender deems necessary. Subordinated Creditor hereby waives any rights it may have against Lender and the holders of Senior Debt in connection with the sale, transfer or other disposition of Collateral; provided Subordinated Creditor reserves the right to enforce any claims it may have under the Uniform Commercial Code due to the Lender conducting a foreclosure sale in a manner that is not commercially reasonable as determined in accordance with the terms thereof.

(e)     Until the Senior Debt is Paid in Full, Subordinated Creditor hereby waives any right to compel any marshaling of any of the Collateral. Subordinated Creditor hereby waives any liability of Lender for any special, indirect, consequential or punitive damages.

9

3.    **Modifications.**

3.1    **Modifications to Senior Debt Documents.** Lender may at any time and from time to time without the consent of or notice to Subordinated Creditor, without incurring liability to Subordinated Creditor and without impairing or releasing the obligations of Subordinated Creditor under this Agreement, change the manner or place of payment or extend the time of payment of or renew or alter any of the terms of the Senior Debt, or amend in any manner any agreement, note, guaranty or other instrument evidencing or securing or otherwise relating to the Senior Debt.

3.2    **Modifications to Subordinated Debt Documents.** Until the Senior Debt has been Paid in Full, and notwithstanding anything to the contrary contained in the Subordinated Debt Documents, Subordinated Creditor shall not, without the prior written consent of Lender, agree to any amendment, modification or supplement to the Subordinated Debt Documents the effect of which is to (a) increase the maximum principal amount of the Subordinated Debt or rate of interest on any of the Subordinated Debt, (b) change the dates upon which payments of principal or interest on the Subordinated Debt are due, (c) change or add any event of default or any covenant with respect to the Subordinated Debt, (d) change any redemption or prepayment provisions of the Subordinated Debt, (e) alter the subordination provisions with respect to the Subordinated Debt, including, without limitation, subordinating the Subordinated Debt to any other indebtedness, (f) take any liens or security interests in any assets of the Company or any guarantor of the Subordinated Debt except for those granted pursuant to the Subordinated Security Agreement or (g) change or amend any other term of the Subordinated Debt Documents if such change or amendment would result in a Senior Default, increase the obligations of the Company or any guarantor of the Subordinated Debt or confer additional material rights on Subordinated Creditor or any other holder of the Subordinated Debt in a manner adverse to the Company, any such guarantor or Lender.

4.    **Representations and Warranties.**

4.1    **Representations and Warranties of Subordinated Creditor.** Subordinated Creditor hereby represents and warrants to Lender that as of the date hereof: (a) Subordinated Creditor is a corporation duly formed and validly existing under the laws of the State of Kansas; (b) Subordinated Creditor has the power and authority to enter into, execute, deliver and carry out the terms of this Agreement, all of which have been duly authorized by all proper and necessary action; (c) the execution of this Agreement by Subordinated Creditor will not violate or conflict with the organizational documents of Subordinated Creditor, any material agreement binding upon Subordinated Creditor or any law, regulation or order or require any consent or approval which has not been obtained; (d) this Agreement is the legal, valid and binding obligation of Subordinated Creditor, enforceable against Subordinated Creditor in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by equitable principles; (e) Subordinated Creditor is the sole owner, beneficially and of record, of the Subordinated Debt Documents and the Subordinated Debt; and (f) the Subordinated Debt is secured solely by the Liens and security interests granted pursuant to the Subordinated Security Agreement.

**4.2     Representations and Warranties of Lender.**  Lender hereby represents and warrants to Subordinated Creditor that as of the date hereof: (a) Lender is a limited liability company duly formed and validly existing under the laws of the State of Illinois; (b) Lender has the power and authority to enter into, execute, deliver and carry out the terms of this Agreement, all of which have been duly authorized by all proper and necessary action; (c) the execution of this Agreement by Lender will not violate or conflict with the organizational documents of Lender, any material agreement binding upon Lender or any law, regulation or order or require any consent or approval which has not been obtained; and (d) this Agreement is the legal, valid and binding obligation of Lender, enforceable against Lender in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally or by equitable principles.

**5.     Subrogation.**  Subject to the Payment in Full of all Senior Debt, Subordinated Creditor shall be subrogated to the rights of Lender to receive Distributions with respect to the Senior Debt until the Subordinated Debt is paid in full. Until the Senior Debt is Paid in Full, Subordinated Creditor agrees that in the event that all or any part of a payment made with respect to the Senior Debt is recovered from the holders of the Senior Debt in a Proceeding or otherwise, any Distribution received by Subordinated Creditor with respect to the Subordinated Debt at any time after the date of the payment that is so recovered, whether pursuant to the right of subrogation provided for in this Agreement or otherwise, shall be deemed to have been received by Subordinated Creditor in trust as property of the holders of the Senior Debt and Subordinated Creditor shall forthwith deliver the same to the Lender for application to the Senior Debt. A Distribution made pursuant to this Agreement to Lender which otherwise would have been made to Subordinated Creditor that subsequently is delivered by Lender to Subordinated Creditor is not, as between the Company and Subordinated Creditor, a payment by the Company to or on account of the Senior Debt.

**6.     Modification.**  Any modification or waiver of any provision of this Agreement, or any consent to any departure by any party from the terms hereof, shall not be effective in any event unless the same is in writing and signed by Lender and Subordinated Creditor, and then such modification, waiver or consent shall be effective only in the specific instance and for the specific purpose given.  Any notice to or demand on any party hereto in any event not specifically required hereunder shall not entitle the party receiving such notice or demand to any other or further notice or demand in the same, similar or other circumstances unless specifically required hereunder.

**7.     Further Assurances.**  Each party to this Agreement promptly will execute and deliver such further instruments and agreements and do such further acts and things as may be reasonably requested in writing by any other party hereto that may be necessary or desirable in order to effect fully the purposes of this Agreement.

**8.     Notices.**  Unless otherwise specifically provided herein, any notice delivered under this Agreement shall be in writing addressed to the respective party as set forth below and may be personally served, sent by facsimile transmission or sent by overnight courier service or certified

11

or registered United States mail and shall be deemed to have been given (a) if delivered in person, when delivered; (b) if delivered by facsimile transmission, on the date of transmission if transmitted on a business day before 4:00 p.m. (Chicago time) or, if not, on the next succeeding business day; (c) if delivered by overnight courier, one business day after delivery to such courier properly addressed; or (d) if by United States mail, four business days after deposit in the United States mail, postage prepaid and properly addressed.

Notices shall be addressed as follows:

If to Subordinated Creditor:

C & C Consulting, Inc.
1811 West 6th Avenue
Emporia, Kansas 66801
Attention:    Edward Lipson
Facsimile:    (620) 342-7617

With a copy to:

The Law Office of Dan J. Alpert
2120 N. 21st Rd.
Arlington, Virginia 22201
Attention:    Dan J. Alpert, Esq.
Facsimile:    (703) 243-8692

If to the Company:

3 Point Media – Kansas, LLC
c/o Marathon Media
980 N. Michigan Avenue, Suite 1880
Chicago, Illinois 60611
Attention:    Bruce A. Buzil
Facsimile:    (312) 587-9520

With a copy to:

Greenburg Traurig
77 West Wacker Drive, Suite 2500
Chicago, Illinois 60601
Attention:    Robert E. Neiman
Facsimile:    (312) 456-8435

12

If to Lender:

Monroe Capital Funding, LLC
c/o Monroe Investments, Inc.
One Northbrook Place
5 Revere Drive, Suite 510
Northbrook, Illinois 60062
Attention:    Theodore L. Koenig
Facsimile:    (847) 559-9330

With a copy to:

Katten Muchin Zavis Rosenman
525 West Monroe Street, Suite 1600
Chicago, Illinois 60661
Attention:    Saul Rudo, Esq.
Facsimile:    (312) 902-1061

or in any case, to such other address as the party addressed shall have previously designated by written notice to the serving party, given in accordance with this Section 8.

9.      **Successors and Assigns**. This Agreement shall inure to the benefit of, and shall be binding upon, the respective successors and assigns of Lender, Subordinated Creditor and the Company.  To the extent permitted under the Senior Debt Documents, Lender may, from time to time, without notice to Subordinated Creditor, assign or transfer any or all of the Senior Debt or any interest therein to any Person and, notwithstanding any such assignment or transfer, or any subsequent assignment or transfer, the Senior Debt shall, subject to the terms hereof, be and remain Senior Debt for purposes of this Agreement, and every permitted assignee or transferee of any of the Senior Debt or of any interest therein shall, to the extent of the interest of such permitted assignee or transferee in the Senior Debt, be entitled to rely upon and be the third party beneficiary of the subordination provided under this Agreement and shall be entitled to enforce the terms and provisions hereof to the same extent as if such assignee or transferee were initially a party hereto.

10.     **Relative Rights**.     This Agreement shall define the relative rights of Lender and Subordinated Creditor. Nothing in this Agreement shall (a) impair, as among the Company and Lender and as between the Company and Subordinated Creditor, the obligation of the Company with respect to the payment of the Senior Debt and the Subordinated Debt in accordance with their respective terms, or (b) affect the relative rights of Lender or Subordinated Creditor with respect to any other creditors of the Company.

11.     **Conflict**. In the event of any conflict between any term, covenant or condition of this Agreement and any term, covenant or condition of any of the Subordinated Debt Documents, the provisions of this Agreement shall control and govern.

12.    <u>Headings</u>. The paragraph headings used in this Agreement are for convenience only and shall not affect the interpretation of any of the provisions hereof.

13.    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

14.    <u>Severability</u>. In the event that any provision of this Agreement is deemed to be invalid, illegal or unenforceable by reason of the operation of any law or by reason of the interpretation placed thereon by any court or governmental authority, the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby, and the affected provision shall be modified to the minimum extent permitted by law so as most fully to achieve the intention of this Agreement.

15.    <u>Continuation of Subordination; Termination of Agreement</u>. This Agreement shall remain in full force and effect until the Payment in Full of the Senior Debt, after which this Agreement shall terminate without further action on the part of the parties hereto.

16.    <u>GOVERNING LAW; SUBMISSION TO JURISDICTION</u>. THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES. EACH OF COMPANY AND SUBORDINATED CREDITOR HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE COUNTY OF COOK, STATE OF ILLINOIS AND IRREVOCABLY AGREES THAT, SUBJECT TO LENDER'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE LITIGATED IN SUCH COURTS. EACH OF COMPANY AND SUBORDINATED CREDITORS HEREBY WAIVES PERSONAL SERVICES OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON IT BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO IT AT THE ADDRESS SET FORTH IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.

17.    <u>WAIVER OF JURY TRIAL</u>. EACH OF SUBORDINATED CREDITOR, THE COMPANY AND LENDER HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

[remainder of this page intentionally left blank; signature page follows]

14

IN WITNESS WHEREOF, Subordinated Creditor, the Company and Lender have caused this Agreement to be executed as of the date first above written.

SUBORDINATED CREDITOR:

C & C CONSULTING, INC.,
a Kansas corporation

By: _____
Name: _____
Title: _____

COMPANY:

3 POINT MEDIA – KANSAS, LLC,
an Illinois limited liability company

By: _____
Name: _____
Title: _____

LENDER:

MONROE CAPITAL FUNDING, LLC,
an Illinois limited liability company

By: _____
Name: _____
Title: _____

Subordination and Intercreditor Agreement

IN WITNESS WHEREOF, Subordinated Creditor, the Company and Lender have caused this Agreement to be executed as of the date first above written.

**SUBORDINATED CREDITOR:**

**C & C CONSULTING, INC.,**
**a Kansas corporation**

By: _[signature]_
Name: Edward A. Lipson
Title: President

**COMPANY:**

**3 POINT MEDIA – KANSAS, LLC,**
**an Illinois limited liability company**

By: _____
Name: _____
Title: _____

**LENDER:**

**MONROE CAPITAL FUNDING, LLC,**
**an Illinois limited liability company**

By: _____
Name: _____
Title: _____

Subordination and Intercreditor Agreement

**EXHIBIT 5**
**CONSENT WAIVER AND FORBEARANCE AGREEMENT**

EXECUTION COPY

## Consent Waiver and Forbearance

Dated as of August 3, 2006

Reference is hereby made to that certain Promissory Note (the "Note"), dated as of February 13, 2004, in the original principal amount of One Million Dollars ($1,000,000), made by 3 POINT MEDIA -- KANSAS, LLC, an Illinois limited liability company (the "Maker"), for the benefit of C & C CONSULTING, INC., a Kansas corporation, ("Payee"). All capitalized terms contained herein shall, unless otherwise defined herein, have the meaning ascribed to them in the Note.

Maker and Payee agree and acknowledge that as of the date hereof the Note is in Default. Maker and Payee also agree and acknowledge that they are in continuing negotiations to restructure the Note and to cure any Defaults. Despite the existence of the Default under the Note, Payee agrees, that it shall forbear from exercising any and all of its rights and remedies under the Note, at law or in equity until January 31st, 2007.

Notwithstanding anything to the contrary contained in the Note, the Maker hereby consents and agrees that Payee shall be permitted and allowed to pledge the right to receive Three Hundred Thousand Dollars ($300,000) of proceeds from payment of the Note to Lions County Bank as security for a loan made to Edward A. Lipson. Nothing contained in this Consent shall be deemed to constitute a waiver or modification of any rights of the Maker or Payee has or may have under the Note (except as expressly provided for herein).

[Signature Page Follows]

BST99 1421705-5.062992.0010

IN WITNESS WHEREOF, the party hereto has executed this Consent  Waiver and Forbearance as of the date first above written.

3 POINT MEDIA KANSAS, LLC

By:     _____
Name:   _____
Title:  _____

C & C CONSULTING, INC.

By:     _____
Name:   _____
Title:  _____